May it please the Court, good morning, Your Honors. I'm Jay Lichtman. I would like to split the argument with my colleague, Mr. Harris, and reserve a few minutes for rebuttal. Well, that's ten minutes, and we're splitting it in three. How are we doing that? Four, four, and two, Your Honor. All right. Do your best. Four, four, and two. Your Honors, this is a unique wiretap necessity case. It's unique because the informant in this case was the shot caller or the CEO of the gang, and in that capacity he had the control over all gang activities. He knew the identity of the gang members, the drug dealers, the suppliers, the clique leaders. He conducted the gang meetings. There were sign-in books of gang members. He had restructured the gang and established the gang rules. He set up the tax collection procedure for the Mexican mafia. He controlled the heroin and methamphetamine delivery systems. Essentially, he knew everything needed for the government's investigation, but the government chose to seek wiretaps rather than rely on the informant, Jonathan Brockes. This was not correct. The affidavit submitted by the government thoroughly explained that, didn't it? I think the explanations that were given by the agent in the affidavit and adopted by the district court were in error. If you look at- Well, in error, maybe you think so, but I guess what I'm trying to figure out when I'm looking at this is, did this affidavit contain a material misstatement or omission? And it seems to me your argument is that the omission is they could have used Brockes as the confidential informant instead of using the wiretap, right? We're not arguing a frank omission of material statements. We're saying that the necessity was not shown sufficiently that the district court- And what is my standard of review on that? The standard of review as to a full and complete statement is de novo, and the standard of review for whether the district- Well, full and complete statement I think you just eliminated. What we're really down to is, is the affidavit sufficient for the district court to make the determination that at this point the wiretap was necessary? Well, that's part of it. The other part is I think you need to look at de novo review as to whether the denial of the suppression motion was correct. And really what it comes down to is looking at the justification that was offered by the government and adopted by the district court to justify the wiretap in this case. And so- Well, but what I'm really talking about here, maybe I'm missing your argument. I tried to read it pretty carefully. Your argument is that they should have used Brockes as the confidential informant, but the affidavit specifically addressed why they didn't use him- Yes, sir. And why it wasn't a viable option. At that point, the court reviews the affidavit and tries to determine if the wiretap is necessary. At that point, it's an abuse of discretion determination. I can understand if they missed information, but they didn't miss information. They told them directly right there why they weren't using Brockes as the viable alternative. But if you look at the reasons that were provided as to why they didn't use Brockes, the reasons just don't carry much weight. They really, in our view, they're really excuses that the government offered to justify getting the wiretaps. Well, to be fair, I don't have a lot of, in my own view, I can't by my panel, I don't have a lot of respect for the idea that, oh, they had to talk about the availability of the state wiretaps or they had to do that. I don't think that's in our jurisprudence at all. So that's why I concentrated on did the affidavit say why they weren't going to use Brockes and was it enough? That's what I concentrated on. Now you tell me I'm wrong. Well, I gave you several examples. One of the reasons they offer to justify not using Brockes is they refer to this April 7th traffic stop and they say Brockes was not willing to cooperate. But, in fact, that wasn't the case because we know and we've submitted the interview report of the April 7th stop that he, in fact, did cooperate. He indicated during... But when did he say, where did they say that he wasn't willing to cooperate? I didn't see that in either place either. It's in our brief. No. I want to know where they told the judge that he wasn't willing to cooperate. I think they made the argument in the brief that he wasn't willing to cooperate. What difference does that make? I want to know what he told, what they told the judge about why it was necessary. Did they tell her he wasn't willing to cooperate? What they said was that in the April 7th stop, Brockes wasn't willing to cooperate. Where did they say that? That's what I'm asking you. In the affidavit. I'm not finding it. Where is it? We will get that for you, Your Honor. Okay. But, in fact, regarding that stop, Brockes was interviewed and he told that he admitted he was the shot caller of the gang. He identified the two Mexican Mafia members who he worked for. And, in fact, he arranged for the police to be present during the hand-to-hand drug delivery that occurred on April 8th. So you're through your four minutes. In fact, you're into the two-minute rebuttal and you haven't given him any time. All right. Well, then, I'll defer to Mr. Harris, then, and perhaps he could pick up where I left off. Please, the Court, good morning. William Harris on behalf of Mark Rios. I think what you were looking for on the April 7th is 9-11 of the excerpts. That was the DEA FBI 302 regarding the April 7th, where he first says Brockes was not in a position to testify, but later on the same page it says he was willing to cooperate. Was that something that was before the district court, Judge? This whole record was before the district court, Judge. No. At the time the T3 was signed? No. Okay. That's my question. So the point, some of the excuses that were given to get to Judge Smith's point were sort of on the face of them, sort of pretextual, didn't carry much weight. Those are great words, but they don't go to the facts. I can argue anything's pretextual and just say that, but get to the facts. I mean, I read the affidavit. It doesn't seem pretextual to me. The facts therein are pretty straightforward. He said that Brockes, Tileman said Brockes was not forthcoming on the amounts of drugs, when they were delivered and from whom. Well, those questions were not asked to him. See, they interviewed Brockes a first time. It was a preliminary interview, and then in retrospect he said, well, Brockes didn't say this, Brockes didn't say that. Well, they don't say that they ever point blank asked him those questions, and that was one of the excuses given, that he didn't disclose the types of narcotics or the transporters. Well, once again, never asked those questions. Didn't disclose the subsequent in May jail calls from this Mexican mafia figure Hernandez the next month. Well, at that point he was not in contact with these people, and so in retrospect saying that he didn't provide information, well, he wasn't asked for that, and he wasn't in a position to provide that. So this is what I mean by pretextual. And the suggestion that Brockes, if we do ask him questions, he would. Well, let's suppose, I mean, it seems to me that the declarations are, I mean, the affidavit is at least not specific about the sense in which he was, quote, not forthcoming, whether he just didn't volunteer it or whether he was asked and didn't answer it right. Now, the question is whether the, if the district judge, I mean, could have inquired. We don't know that she did, right? But she's the same district judge who ultimately approved this. Correct. It was, yeah, the reviewing judge and the issuing judge. So she seemed to think that she had enough information in this affidavit. Well, in the final order denying the wiretap motion, she basically said that the subsequent fact that they used Brockes as the grand jury witness, the star witness in trial, didn't change the analysis, didn't, and I disagree. I think that's where she was incorrect on that point. Because the subsequent history sheds light on whether the contemporaneous excuses given by the agent in the affidavit were pretextual or not. What was the time lag between the Title III application and the ultimate entry of a cooperation agreement by Brockes? The last wire, target telephone, there were 14 wires. The last wire expired on 1-27-11. And to answer your question, 4-24-12 was the cooperation agreement with Brockes. However, the ‑‑ So if they waited to sign up Brockes as a cooperator, they would never have gotten any of this information. Well, no. The problem is that before the last wire expired, two weeks before that, on January 11, 2011, Brockes had a detailed debrief interview. Was that his first proper session? No. The first proper session was on April 7 on the traffic stop. You call that a proper session? I was going to say, that's a proper session. It was a cooperation agreement where the next day he does a controlled money delivery to this guy. And then on July 8, he's asked by the task force about this murder, this July 3 murder of Daniel Martinez. And he gives them information about that. So the point is that Brockes' cooperation, there was before the wiretaps, there was substantial cooperation. There was a hiatus during the wiretaps conveniently. And then just as the wiretaps on the, you know, a few minutes before midnight on the last wire, it was about to expire, they do, Brockes suddenly is rehabilitated and cooperates. Let me ask you. And becomes the principal witness after that. Is there any, how many times has this court found a lack of necessity and how would you, and. Few and far between the. In what ways would you say that this case is special? This is special due to the identity of the cooperating witness. And the fact that to some degree he was cooperating. Pardon me? And the fact that to some degree he was cooperating. Yes. And he could have been used. I mean, how often do you see the apex of the organization? That's what distinguishes this case in my mind from the two cooperator cases cited by the district court in the order. The Canales-Gomez case were sort of low-level cooperators that were in jail in Ohio or something. They were unavailable. In the Rivera case, once again, just people that didn't have access to the inner circle here. You know, in the Canales-Gomez case, if they had had as a cooperator, the head of the organization, Jesus Gomez or Frank Leal, it would have been a different result. There would have been no necessity then. And in the Rivera case, if you had the Rivera brothers, they were the head, this is the Rivera drug trafficking organization. If you had the guy at the head cooperating, you know, if that doesn't defeat necessity, I don't know what could. I mean, that's the gold standard. If you've got somebody at the head of the organization with the tentacles that reach all the way in, and I cited how, you know, the Overt Acts, 414 out of 502 Overt Acts were directly involved with this guy Brockes. I mean, his tentacles reached everywhere. 47 of the 52. Thank you. The time is up. We've given up the rebuttal time. We'll give one of you a minute in rebuttal. Thank you. May it please the Court. Ilana Artsin on behalf of the United States. I would submit that Judge Smith has the correct framework for analyzing this case. This is not a case where there are any omitted facts. Well, there's at least a hole in the facts, which is whether when you say he's not forthcoming, you mean we asked him and he wouldn't answer or he just didn't volunteer it. Wouldn't that matter? I would submit, Your Honor, that it does not matter because there are three reasons that Judge Tillman gave here for why further interviews of Brockes would not achieve. Who gave them? I'm sorry. Oh, okay. All right. One of them was this thing about this counter-surveillance, which didn't make a lot of sense. Well, what that's related to is whether he is likely to provide misinformation or alert others to the investigation. But he provided, I mean, the whole story doesn't make a lot of sense. He was apparently driving around weirdly, and then he calls it up and says, I'm going to go find this guy at a certain place, and they did. But before that, the government has to be able to corroborate their cooperators. This Court has repeatedly admonished the government that cooperators can potentially be untrustworthy and has warned the government that it has to carefully monitor and supervise. Meaning that they have to be able to follow him? They have to be able to corroborate their cooperators. Tell me exactly what you mean by that. Well, in Canales-Gomez. I want to know here, in what sense there was a problem corroborating their. Well, here the problem is if we're going to be relying on this individual's testimony without any wiretaps, we have to be able to corroborate that in some form, either by physically surveilling him,  He called him and said, I'm going to go meet this guy at this corner, and he did, and they were there. But prior to that time, he's driving around with $1,000 of the government's money, and we don't know where he is. Let's imagine the cross-examination at trial when we can't corroborate where that individual was during the entire time that he had the government's money. If we're relying solely on this individual to make our case, that's what the inquiry is here. Why does the problem at trial with the fact that he went where he said he was going to go and they actually physically saw the transaction with the government's money? Because the affidavit established two problems with the ability to surveil. And this Court said in cases such as Rivera that when there's counter-surveillance, that's a reason to believe that necessity is found. So what is necessary to corroborate a transaction is being able to continuously surveil it. Otherwise, we don't know what happened during the time that we didn't see that individual. We saw in the affidavits, there was evidence presented in the affidavits, for example, that there was a controlled delivery of money by a different informant to Brockes. And because there was a very large presence of gang activity, they couldn't perform continuous surveillance. They could only do sort of drive-bys. Is there any evidence that, I mean, they did talk to him. He told them what his position was in this context. He was obviously putting himself on the line to some degree by doing that. He does cooperate to some degree. There's nothing that says they asked him and he wouldn't do it in terms of a cooperation agreement or anything else. Well, there's also nothing in this court's case law that requires that. What this court has said is, first of all, the mere attainment of some degree of success does not eliminate the need for a wiretap, and that necessity is evaluated in light of, A, the need to, that the government has a lot of leeway when it is investigating a conspiracy because it has to be able to uncover the full scope, that it has to have an effective case at trial, meaning being able to prove it beyond a reasonable doubt, and that it has to be wary of untrustworthy cooperators. And that's why in Canales-Gomez, the court explained that wiretap evidence is very valuable corroboration of informant testimony. So in this case, the affidavit set forth a great deal of evidence for why. Well, but it's all sort of indistinct. Well, I believe, just a minute, I believe based on my involvement in this investigation and my training and experience that Brockes minimized his role in an ongoing criminal conspiracy. For example, during the custodial interview, Brockes admitted that he does collect money, however, he was not forthcoming about the amounts of money he collects. When he collects it and from whom he collects the money from. He never told the interviewing TFOs about the types of narcotics being distributed, and he has never contacted them to discuss his jail conversations with them. So I take this to mean he wasn't forthcoming, meaning he didn't volunteer it. And the government is testing this individual to see, is he going to be a reliable cooperator? Is he going to provide complete information, or is he going to go and alert his co-conspirators to what the government is investigating and make it more difficult to investigate? Well, if he was going to do that, he would have already done it because they did stop him, and he did tell him whatever he told them, and he did participate in this controlled sale. Right, and he provided limited information, and so we have to look at the context of what went on in April. In April, he cooperated in one discreet situation to protect his girlfriend and himself. So what did the affidavit lay out about that contact? That he was stopped, his girlfriend was arrested with meth on her person, and he wanted to take responsibility so that his girlfriend wouldn't go to jail. In addition, he was in a pickle because the money that was in the car had been seized, and that money he was supposed to be delivering to the MA the next day. So he provided the minimal level of cooperation necessarily to get out of that pickle. He agreed to make a controlled delivery so that the agents could identify the person he was delivering to. So there are two things that we've learned from this. One is the fact that he cooperated in this discreet situation in no way allows the inference that that limited cooperation shows that he is willing to give up his criminal livelihood and fully cooperate, particularly given the known propensity of the Mexican mafia as well as the gang to brutally retaliate against cooperators. And the second thing we know is that he can't deliver the entire enterprise. He didn't know anything about CHAMP. He had a moniker and a number. He was willing to help the government identify him, but he didn't have any information about who he was collecting for the Mexican mafia. All he knew was, I'm supposed to meet this person whose first name and last name I don't even know. So again, going back to whether this is an individual who can accomplish all of the goals of the investigation, he doesn't have complete information. And I would submit that this case is not unique. This case is actually very similar to what happened in the Shriot case, also a Mexican mafia case, where the cooperator was somebody who was very, very high up in the organization. He had consensually recorded many conversations. He had video and audio taped a number of meetings among the top leadership of the Mexican mafia. And even in that case, this court held that there was necessity for a wiretap because neither that individual nor any of the other cooperators knew all of the information that related to the entire conspiracy. That's exactly the situation that we have here. And again, although this information was not in the affidavit, what the hearing on the wiretap showed is that there were not omissions in that regard. In other words, they had not underestimated his ability to provide information. And again, we don't know if it's because he didn't have it or he wasn't willing to give it. But in April, he didn't provide the information. In May, after we received jail calls between Bracas and Sal Hernandez, he didn't come and say, hey, I'm cooperating. Here's some more information for you. And when he was approached in July, and this is all before the affidavit, to ask about whether he knew anything about the murder of Daniel Martinez, he had no information. So, again, whether it's that he wasn't… He had no information or he didn't have much information? He said he didn't have any solid information about who had killed Martinez. I thought they pointed to… He had some surmise. He had no solid information. So, again, whether he's telling the truth or not, it really doesn't matter. He can't deliver the entire organization without a wiretap. And is the wiretap going to help him deliver it if he still doesn't know the people? Either he knows Champ or he doesn't know. He's not going to know Champ anymore by listening on the telephone. No, but that wiretap is going to give us the opportunity to get whatever information is out there. No, it's only going to give him whatever information he participates in. Or that is relayed to him. Right, which he could also give by giving it. If we had trustworthy information that he was willing to give us and could corroborate. I mean, as to the wire… I mean, this argument just seems wrong-headed because the question is whether they could have gotten the information on the wiretaps from him. Well, if he was trustworthy, of course, they could. The problem, of course, is they wouldn't have the wiretaps to prove what he said. But the statute seems to admit of that by saying there has to be necessity. If the necessity is it's always better to have the wiretap than to have somebody telling us something who could be cross-examined, then it's a non-standard. Well, I don't think it's an either-or. And I think the standard here is that there were specific statements in the affidavits as to why this individual could not help obtain… Well, they weren't specific. They just said that he wasn't forthcoming about this and that. But they didn't say… Right. That he was – that we don't think that we can make our entire case on him because he's not likely to cooperate, because he hasn't provided complete information, because he's likely to provide misinformation. And the question that this Court has to decide is did the issuing judge… It's not facts. But there were facts that supported all of that regarding what happened during the April interview and the information that wasn't provided regarding the counter-surveillance, regarding the circumstances of April 7th. Is there any report of the April interview? It is. It's at page 911. The first thing that it says is that he's not willing to testify. And I would submit that that's actually the end of the matter because if he's not willing to testify, he can't be a cooperator and make the whole case. But ultimately, the question here, as Judge Smith said at the beginning of my opponent's argument, is did the issuing judge clearly err or abuse her discretion in concluding that a wiretap was necessary because the goals of the investigation could not be met solely by using Brokus as a cooperator? And if that was not a clearly erroneous finding, and I submit it was not, this Court must affirm. Thank you. Thank you. Yes, just a couple of quick points in response. Obviously, you need more than the naked testimony of Brokus at the time of trial to make the case. But what could have been done was a penis cooperation and make each one of these wiretap calls could have been a consensually recorded call. They were all on Brokus's phone. You go through the indictment and they talk about each of these wiretap. That's the whole darn case. And these calls could have been made with consensual recordings, eliminating the privacy problem. Well, the problem, of course, isn't your client's privacy problem. Pardon me? The privacy problem isn't your client's privacy problem in that regard. The society's privacy problem. Why wiretaps are a disfavored, intrusive method of making a criminal case. So it's clear that it could have been done. Nobody disputes that, that if Brokus had been brought on board and he was cooperating, he could have made all these same calls that are all the calls referenced in the indictment could have been consensually recorded calls placed by Brokus. So does it come down to that the necessity standard requires that they have asked Brokus whether he was willing to be wired essentially and only if he said no could they do it? Is that essentially the question? Yeah, I mean, then that's different. If he said I'm not going to do it. My answer is different. Is that sufficient necessity? If he, if Brokus... Is the problem that they didn't ask him that, is that the problem? That they had to ask him that? I'm trying to figure out what this necessity means. Our cases are very fuzzy. Necessity means if there are available traditional investigative techniques available... All right, well, does it have to be known that they're available or do they have to make some inquiry, i.e., do they have to ask him to put himself on a wire or can they just surmise that he won't do it? No, the former. I mean, I think they have to... Frankly, I don't think you're answering the question. I think you're not answering the question because you don't want to answer it. The question was very specific. Would it have been okay if they'd asked him first and he just said no to do what they did? Yes. Are you saying yes, that was okay? That's what she's asking. Oh, then I misunderstood. No, if Brokus says no, I'm not going to play ball with you guys, then that's a different situation entirely. Well, play ball specifically by wearing a wire. In other words, they have an interest in having an actual tape rather than having somebody recite what happened... Agreed. ...in a way that could be challenged. Yes. So it comes down to the question that they needed to ask him whether he would wear a wire and they didn't do that. Is that what it comes down to? Correct. Yeah, they didn't ask him that. Is that your whole point? Well, the point is that from... Is that your whole point? No. What else is there? The main point is that from the get-go on April 7, Brokus was cooperating. He played ball to the extent they asked him to play ball. He answered... Well, what do you think the interview shows about that? I asked the question and I can't find the interview easily, but could we tell from the interview whether the things they said he was not forthcoming on, they ever asked him or not? No, the words are that he wasn't forthcoming, but I mean... I'm asking you about the interview. There's apparently a record. April 7 interview? Yes. They never asked him the questions point-blank. That's what I'm asking you. What does it show you? I can't... Do you know where that is in the record, the interview transcript? All right, well, maybe somebody can send me a note about where it is in the record because I couldn't find it easily, or I will find it. 9-10, correct. 9-1-1, April 7, 2010 interview, 9-1-1 of the excerpts. So if I understand your question correctly, if they had, at that point in time, asked Baracus, will you wear a wire, will you cooperate completely with us, and he had said no, then that's a different situation, and then you've got necessity for the wiretap. Thank you very much. Thank both of you for your useful argument, somewhat useful argument. And the case of United States v. Estrada and Rios is submitted.
judges: Berzon, N.R. Smith, Castel